IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DR. ANA EVERETT, et al.,

    Plaintiffs,

      v.

GEORGIA DEPARTMENT OF
TRANSPORTATION, et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:23-CV-5799-TWT

**OPINION AND ORDER**

This is a civil rights case. It is before the Court on Defendant RMD Holdings, LTD's Motion to Dismiss [Doc. 35], the GDOT Defendants'[1] Motion to Dismiss [Doc. 37], and the GDOT Defendants' Motion to Stay Discovery [Doc. 38]. As explained below, Defendant RMD's Motion to Dismiss [Doc. 35] is GRANTED, the GDOT Defendants' Motion to Dismiss [Doc. 37] is GRANTED in part and DENIED in part, and the GDOT Defendants' Motion to Stay Discovery [Doc. 38] is DENIED as moot.

          I.      Background[2]

---

[1] The GDOT Defendants are the Georgia Department of Transportation and various individuals affiliated with GDOT who have been sued in their individual capacity. (2d Am. Compl. ¶¶ 4-5). Those individuals are Jill Reule, Russell McMurray, Kelvin Wilson, Langston Johnson, Coady Latimer, Enrique Alonso, and Paul Denard. (*Id.*, at 1-2).

[2] The Court accepts the facts as alleged in the Second Amended Complaint as true for purposes of the present Motion to Dismiss. *Wildling v. DNC Servs. Corp.*, 941 F.3d 1116, 1122 (11th Cir. 2019).

This case involves alleged discrimination and retaliation that denied the Plaintiffs the opportunity to contract with the State of Georgia. Plaintiff Ana Everett is the President and CEO of Plaintiff SolutionsAe, Inc. ("SAE"). (2d Am. Compl. ¶ 3). She is a minority business owner and operator and SAE is a certified Disadvantaged Business Enterprise ("DBE"). (*Id.* ¶¶ 11-12). The Defendants are the GDOT Defendants as well as RMD Holding, Ltd. d/b/a Nationwide Fence & Supply Co. ("RMD"), a for-profit Michigan corporation. (*Id.* at 2, ¶ 6). RMD is a non-minority owned business. (*Id.* ¶ 43).

On December 19, 2018, SAE entered into a Guardrail, Cable Barrier, & Impact Attenuator Maintenance Services Contract ("Contract") with GDOT. (*Id.* ¶ 13, Ex. A). The Contract's term was for one year with the option for up to four one-year renewals. (2d Am. Compl., Ex. A, Art. 130(A), (B)). SAE fully performed under the Contract without any complaints from GDOT until January 2021. (2d Am. Compl. ¶ 15). On or about January 29, 2021, GDOT contacted Everett and advised her that SAE had damaged some utility lines while performing a project under the Contract. (*Id.* ¶ 17). GDOT demanded $11,523.94 for the damages. (*Id.*). Everett responded by stating that she would investigate GDOT's allegations and requested the evidence that supported the allegations. (*Id.* ¶ 18). Everett's investigation concluded that SAE was not at fault for the damage. (*Id.* ¶ 19).

Arcadis, a GDOT contractor, also investigated the damage and concluded that SAE was not at fault. (*Id.* ¶ 20). On February 23, 2021, the results of Arcadis's investigation were emailed to GDOT employees Wilson, Reule, and Johnson. (*Id.* ¶ 21). That email was sent by Ryan Anderson and stated:

> I checked the guardrail database and Solutions AE did replace the anchor at this location on 1/25/2021. But they didn't hit the fiber in the area. Please see the attached pics taken on 2/3/2021 when we were conducting the field verification that the repair was done etc. I don't know who this contractor is digging behind the anchor but most certainly they likely hit the fiber. It does appear that SolutionsAe did follow protocol and had a utility locate performed for this location. I hope this helps.

(*Id.*).

Contrary to this finding, the GDOT Defendants continued to assert that SAE was responsible for the damages. Less than two hours after she received this email, Reule sent an email to eight GDOT employees and contractors, including Wilson, advising them to "write up a scope for the repairs and have it ready to invoice to Solutions asap." (*Id.* ¶ 22). On February 26, 2021, a GDOT contractor emailed SAE stating that it was instructed by GDOT to send SAE an invoice and that the assignment of damage to SAE was "the result of a professional investigation and records provided." (*Id.* ¶ 23). On March 1, 2021, Reule also sent an email to Everett stating that the damage was done by SAE. (*Id.* ¶ 24). In a March 3, 2021 email, Reule told other GDOT-affiliated individuals that SAE did not admit being present or having fault in the damage

3

but that Anderson confirmed SAE's presence. (*Id.* ¶ 27). Yet, she omitted the fact that Anderson found that SAE was not responsible for the damages. (*Id.* ¶ 28). Similarly, in a May 5, 2021 email, Reule stated that Anderson "checked the guardrail database and confirmed that the work was done by SolutionsAE," without stating Anderson's conclusion that SAE was not at fault. (*Id.* ¶ 29).

It was not until May 24, 2021 that Everett learned of the Anderson email that stated SAE was not at fault, when she was copied on an email that contained and referenced the Anderson email. (*Id.*). SAE had sent the demanded amount prior to seeing that email, but the payment was returned because the invoice provided contained the wrong address. (*Id.* ¶ 30). Throughout the time that GDOT was demanding payment, Reule treated Everett disrespectfully and talked down to her. (*Id.* ¶ 31). For example, she would call Everett "girl" or refuse to address her as "Dr. Everett" and instead referred to her as "Ms. Everett." (*Id.*).

Based on these events, Everett filed a Title VI complaint with Denard, the Director of GDOT's District 7 in Chamblee, Georgia, on June 9, 2021. (*Id.* ¶ 33). The Title VI complaint alleged racial and sex-based discrimination as well as retaliation. (*Id.*). In the complaint, she objected to both GDOT's insistence that SAE pay $11,523.94 for the damage as well as its withholding of $228,981.52 in payments that were owed to SAE. (*Id.*). However, Denard failed to take appropriate steps to remedy the discrimination. (*Id.* ¶ 35).

Instead, GDOT continued to require payment for the damaged cable even though a third-party contractor told Everett that "it's in our system that [SAE] didn't do it." (*Id.* ¶ 36).

On December 20, 2021, GDOT informed Everett that SAE had not applied for a renewal of the Contract and that it was already too late to apply. (*Id.* ¶ 38). In 2019 and 2020, SAE's contract was renewed automatically, and Everett was never required to submit an application. (*Id.* ¶¶ 14, 38). GDOT also advised Everett that SAE was no longer qualified for GDOT contracts and would have to become requalified before it could bid for any contracts. (*Id.* ¶¶ 39-40). Nothing had changed in SAE's status or qualifications since GDOT originally awarded SAE the Contract in 2018. (*Id.* ¶ 39). SAE applied for requalification with GDOT, but GDOT had already transferred the contract to RMD—a non-minority owned business—by the time SAE requalified on September 28, 2022. (*Id.* ¶¶ 41-42).

RMD bid on the contract in late 2021 or early 2022. (*Id.* ¶ 48). At some point in 2021, RMD engaged in discussion with GDOT officials and others seeking to obtain SAE's contract. (*Id.*). The Plaintiffs allege that RMD "took improper action or wrongful conduct to usurp SolutionsAe's contract and business opportunities which action was taken without privilege" and "acted purposely and with malice with the intent to injure." (*Id.*).

5

Based on these actions, the Plaintiffs assert discrimination and retaliation claims against the GDOT Defendants under 42 U.S.C. §§ 1981, 1983 as well as Title VI. (*Id.* ¶¶ 49-69). The Plaintiffs also assert a negligent misrepresentation claim against GDOT pursuant to O.C.G.A. § 50-12-25. (*Id.* ¶¶ 70-73). Finally, the Plaintiffs assert a tortious interference claim against RMD. (*Id.* ¶ 74-76). The Defendants have filed Motions to Dismiss as to all the claims against each of them.

## II. Legal Standard

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); Fed. R. Civ. P. 12(b)(6). A complaint may survive a motion to dismiss for failure to state a claim, however, even if it is "improbable" that a plaintiff would be able to prove those facts; even if the possibility of recovery is extremely "remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff. *See Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994-95 (11th Cir. 1983); *see also Sanjuan v. American Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994) (noting that at the pleading stage, the plaintiff "receives the benefit of imagination"). Generally, notice pleading is all that is

required for a valid complaint. *See Lombard's, Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975 (11th Cir. 1985). Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555).

### III. Discussion

The GDOT Defendants argue that the Plaintiffs' claims against them should be dismissed because of sovereign immunity, the statute of limitations, qualified immunity, and failure to state a claim. RMD contends that the Plaintiffs fail to state a claim against it. The Court considers each argument in turn.

#### A. Sovereign Immunity

The GDOT Defendants assert a sovereign immunity defense with respect to the claims against them. (GDOT Defs.' Br. in Supp. of Mot. to Dismiss, at 8-10, 16-18). The Plaintiffs concede that GDOT is not a proper Defendant as to the federal claims and abandon those claims with respect to GDOT. (Pls.' Br. in Opp'n to GDOT's Mot. to Dismiss, at 3 n.1). The Court construes the Plaintiffs' abandonment as a request for leave to amend the Second Amended Complaint to omit and withdraw GDOT as a defendant in Counts I-V pursuant to Rule 15, which the Court grants. *See Perry v. Schumacher Grp. Of La.*, 891 F.3d 954, 958 (11th Cir. 2018) ("There are

multiple ways to dismiss a single claim without dismissing an entire action. The easiest and most obvious is to seek and obtain leave to amend the complaint to eliminate the remaining claim, pursuant to Rule 15."). This Order effectuates this amendment such that the Plaintiffs shall not be required to docket a Third Amended Complaint to conform the pleadings to the directives of this Order. *See Silver Comet Terminal Partners, LLC v. Paulding Cnty. Airport Auth.*, 2023 WL 2988443, at *9-10 (11th Cir. Apr. 18, 2023).

The GDOT Defendants also contend that the named GDOT-affiliated individuals should be dismissed in their official capacities. (GDOT Defs.' Br. in Supp. of Mot. to Dismiss, at 8-10; GDOT Defs.' Reply Br. in Supp. of Mot. to Dismiss, at 1-2). However, the Second Amended Complaint does not name any individuals in their official capacity, so such action is not appropriate. (*See* 2d Am. Compl., at 1-2).

Finally, the GDOT Defendants argue that the negligent misrepresentation claim is barred by sovereign immunity because the Plaintiffs brought the claim in federal court. (GDOT Defs.' Br. in Supp. of Mot. to Dismiss, at 16-18). The Plaintiffs did not dispute this issue in their Response. *See Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) ("[W]hen a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned." (citation omitted)). Moreover, it appears that the GDOT Defendants' position is

8

supported by their cited authority. *See, e.g.*, O.C.G.A. § 50-21-23(b) ("The state waives its sovereign immunity only to the extent and in the manner provided in this article and only with respect to actions brought in the courts of the State of Georgia. The state does not waive any immunity with respect to actions brought in the courts of the United States."); *Alyshah v. Georgia*, 239 F. App'x 473, 474 (11th Cir. 2007). Therefore, the Court will dismiss the Plaintiffs' negligent misrepresentation claim (Count VII [3]) of the Second Amended Complaint as barred by sovereign immunity.

### B. Statute of Limitations

The GDOT Defendants initially raised an argument asserting that the Plaintiffs' claims were time barred. (GDOT Defs.' Br. in Supp. of Mot. to Dismiss, at 11-12). However, they withdrew the argument in their Reply. (GDOT Defs.' Reply Br. in Supp. of Mot. to Dismiss, at 2-3). Accordingly, the Court declines to address the issue.

### C. Discrimination and Retaliation Claims

The Plaintiffs assert that the GDOT Defendants violated the Plaintiffs' Thirteenth and Fourteenth Amendment rights by discriminating and retaliating against her on the basis of her race and sex. (2d Am. Compl. ¶¶ 49-69). The GDOT Defendants argue that the Plaintiffs fail to state their

---

[3] The Second Amended Complaint skips from Count V to Count VII. (2d Am. Compl. ¶ 67-70). For simplicity's sake, the Court will use the count enumerations as they are presented in the Second Amended Complaint.

9

claims against them and that their actions are protected by qualified immunity. The Court holds that qualified immunity bars all claims except the discrimination claims against Reule.

"Qualified immunity protects government officials performing discretionary functions . . . from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Jacoby v. Baldwin Cnty.*, 835 F.3d 1338, 1343-44 (11th Cir. 2016) (citation omitted). If the official was performing a discretionary function—and there is no dispute that the Defendants here were—"the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Matthews v. Crosby*, 480 F.3d 1265, 1269 (11th Cir. 2007) (citation omitted). "To do so, the plaintiff must: (1) allege facts that establish that the officer violated his constitutional rights; and (2) show that the right involved was clearly established at the time of the putative misconduct." *Jacoby*, 835 F.3d at 1344 (alteration, quotation marks, and citation omitted).

For Defendants Alonso, Denard, Johnson, Latimer, McMurray, and Wilson, the Plaintiffs fail to assert any facts that plausibly show that they acted on the basis of race or sex. Taking the allegations as true and drawing reasonable inferences in the Plaintiffs' favor, the most that can be said is that these individual defendants knew that SAE did not cause the damage to the

utility lines and still attempted to get SAE to pay for it.[4] The Plaintiffs only make conclusory allegations that these Defendants' communications were made with discriminatory or retaliatory intent. (2d Am. Compl. ¶¶ 50-52, 56-57, 61, 65, 68). These allegations are insufficient. *See Iqbal*, 556 U.S. at 678-87.[5] Because the Plaintiffs have failed to "allege facts that establish that [these defendants] violated [the Plaintiffs'] constitutional rights," qualified immunity bars the claims against Alonso, Denard, Johnson, Latimer, McMurray, and Wilson. *Jacoby*, 835 F.3d at 1344 (citation omitted).

The Plaintiffs allege some facts against Reule that the Plaintiffs argue show discriminatory and retaliatory intent. Specifically, they allege:

> Throughout the time period of January 2021 through May 24, 2021, in phone conversations between Reule and Dr. Everett, Reule treated Dr. Everett with disdain and a notable lack of respect, and consistently "talked down" to her. Reule would either call Dr. Everett, "girl," or would refuse to call Dr. Everett by her proper title, "Dr. Everett," instead referring to her as "Ms. Everett."

(2d Am. Compl. ¶ 31). The Court finds that this is sufficient at this stage for the Plaintiffs' discrimination claims against Reule. The Supreme Court has

---

[4] For the claims against Defendant McMurray, even that cannot be said. The Second Amended Complaint does not mention his name once other than to list him as one of the individuals being sued. That is likely why the Plaintiffs acknowledge that they have not stated a claim against him. (Pls.' Br. in Opp'n to GDOT Defs.' Mot. to Dismiss, at 6).

[5] To the extent that Plaintiffs argue otherwise, it is because they rely on the pre-*Iqbal* no-set-of-facts pleading standard. (Pls.' Br. in Opp'n of GDOT Defs.' Mot. to Dismiss, at 4). *Iqbal*'s plausibility standard is the proper standard now.

11

held that referring to an African-American man as "boy" may be evidence of discriminatory intent depending "on various factors including context, inflection, tone of voice, local custom, and historical usage." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006); *see also Evans v. Hillman Grp., Inc.*, 2021 WL 1140100, at *3 (S.D. Ohio Mar. 25, 2021) ("[I]t is plausible that the same [*Ash*] factors could support a finding of racial animus where a Caucasian supervisor refers to her older, African-American employee as 'girl.'"). Here, use of the word "girl" occurred during telephone conversations between an agency and its contractor, and the Plaintiffs allege that, on those telephone calls, Reule talked down to Everett and treated her "with disdain and a notable lack of respect." (2d Am. Compl. ¶ 31). The Court finds that—after drawing all reasonable inferences in favor of the Plaintiffs—this is sufficient at this stage to allege discriminatory intent. Reule may raise this issue again at the summary judgment stage.

Moreover, as to the clearly established prong of qualified immunity, the Eleventh Circuit has held that "[i]t is beyond doubt that the principal right allegedly violated by the defendants—the equal protection right to be free from intentional racial discrimination—[has been] clearly established." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1478 (11th Cir. 1991) (citation omitted). Contrary to the GDOT Defendants' brief, alleging intentional discrimination is not viewing the legal principle at too high of a level of

12

generality. *See Garcia v. Riley*, 2021 WL 4127070, at *3-4 (11th Cir. Sept. 10, 2021). The Court therefore finds dismissal of the discrimination claims against Reule is inappropriate at this time.

However, there are no factual allegations plausibly asserting that Reule retaliated against Plaintiffs for filing their Title VI complaint. The Plaintiffs allege that Reule's communications, which contradicted what the Anderson email stated, were retaliatory. (2d Am. Compl. ¶ 56). However, none of Reule's emails that allegedly conflict with the Anderson email were sent after Plaintiffs made their Title VI complaint. *Cf. Manley v. DeKalb Cnty., Ga.*, 587 F. App'x 507, 512 (11th Cir. 2014) ("Yet if the alleged retaliatory conduct occurred before the employee engaged in protected activity, the two events cannot be causally connected." (citation omitted)). The Plaintiffs also allege that Reule was one of the GDOT employees that told Plaintiffs that they were no longer eligible for GDOT contracts. (2d Am. Compl. ¶¶ 55, 68). The Plaintiffs provide only conclusory allegations to support their claim that this communication was made in retaliation for filing the Title VI complaint. (*Id.* ¶¶ 55, 68). Accordingly, the Plaintiffs' retaliation claim against Reule fails.

### D. Tortious Interference

Count VIII of the Second Amended Complaint is entitled "Tortious Interference with Contractual and Business Relationships." (2d Am. Compl. ¶¶ 74-76). The Court starts by noting that, under Georgia law, "[t]ortious

13

interference with business relations is a distinct and separate tort from that of tortious interference with contractual relations, although some of the elements of the two torts are similar." *Sweet City Landfill, LLC v. Lyon*, 352 Ga. App. 824, 833 (2019) (citation omitted).

> To recover for tortious interference with business relations, a plaintiff must establish that the defendant: (1) acted improperly and without privilege; (2) acted purposely and with malice with the intent to injure; (3) induced a third party or parties not to enter into or continue a business relationship with [the plaintiff]; and (4) caused [the plaintiff] financial injury. To sustain a claim for intentional interference with business relations, the tortfeasor must be an 'intermeddler' acting improperly and without privilege.

*Cox v. City of Atlanta*, 266 Ga. App. 329, 332 (2004) (quotation marks and citations omitted). On the other hand, "[a] cause of action for intentional interference with *contractual* rights must be based on the intentional and non-privileged interference by a third party with *existing* contractual rights and relations." *Tom's Amusement Co., Inc. v. Total Vending Servs.*, 243 Ga. App. 294, 295 (2000) (citation omitted). Accordingly, a plaintiff must allege three elements: "(1) the existence of a contractual relationship; (2) interference from the defendant; and (3) resulting damage to the contractual relationship." *Stamps v. Ford Motor Co.*, 650 F. Supp. 390, 402 (N.D. Ga. 1986) (citation omitted).

The Plaintiffs are not clear about which claim they are pursuing or whether they are pursuing both. Regardless, the Plaintiffs' claim fails. Starting

with the tortious interference with a contractual relationship, the Plaintiffs fail to allege any resulting damage to an existing contractual relationship. The only contract signed between the SAE and GDOT was in 2018. (2d Am. Compl., Ex. A). That contract was set to terminate within one year with the option for up to four one-year renewals. (*Id.*, at Art. 103(A), (B)). GDOT reserved "in its sole discretion" the ability to renew the contract after the initial term ended. (*Id.*). For a renewal to occur, the contract required SAE to provide written notice at least 120 days before the end of the term and affirmed that GDOT "does not accept or acknowledge automatic renewals." (*Id.*, at Art. 103(B)). Despite that requirement, the parties continued to perform for two years after the 2018 contract terminated, even though SAE did not provide written notice of renewal at any time. (2d Am. Compl. ¶ 14).

At most, this indicates that GDOT twice waived the no-automatic-renewal rule. It does not convert the one-year contract with an option for up to four renewals into a five-year contract.[6] This is especially true

---

[6] The Second Amended Complaint alleges that "RMD was aware that the winning bid entitled SolutionsAe to a five (5) year contract." (2d Am. Compl. ¶ 75). However, the attached contract clearly contradicts any idea that the contract had a five-year term. SAE was only "entitled to" one year under the contract with the *option* of four renewals, which GDOT could decide to exercise "in its sole discretion." (*Id.*, Ex. A, at Art. 103(A)). Because the attached exhibit contradicts the allegation, the Court disregards any description of the contract as having a five-year term. *Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016) ("A district court can generally consider exhibits attached to a complaint in ruling on a motion to dismiss, and if the allegations of the complaint about a particular exhibit conflict with the

15

considering that the contract provides that "[a]ny waiver by the Department of a breach of any provision contained in this Contract shall not be deemed to be a waiver of such provision on any subsequent breach of the same or any other provision contained in the Contract." (*Id.*, Ex. A, Art. 127(A)). Nor do any such waiver(s) "serve to establish a course of performance between the parties contradictory to the terms hereof." (*Id.*). The Plaintiffs have provided no basis for asserting that these provisions are inapplicable or unenforceable. Furthermore, there is no dispute that GDOT fully performed on its obligations for the full term of the second renewal, during which RMD allegedly "engaged in discussions with GDOT officials and others." (2d Am. Compl. ¶ 75). Rather, the damage being alleged is that GDOT declined to renew the contract for a third time. The Court therefore finds that the Plaintiffs failed to allege any resulting damage "with *existing* contractual rights and relations." *Tom's Amusement Co., Inc.*, 243 Ga. App. at 295 (citation omitted). Any claim for tortious interference with contractual relations fails as a result.[7]

On the other hand, a claim for tortious interference with business relations does not rely on interference with existing contractual rights. *Cox*, 266 Ga. App., at 332-33. Yet, the Plaintiffs still fail to state a claim because

---

contents of the exhibit itself, the exhibit controls." (citation omitted)).
[7] As described below, the Plaintiffs fail to allege a nonprivileged interference with SAE's relationship with GDOT. This provides an additional, independent reason for dismissing any claim the Plaintiffs make for tortious interference with contractual relations.

they do not plausibly allege any non-privileged interference with SAE's relationship with GDOT. The Second Amended Complaint largely restates the elements of the claim without further factual allegations. The only details that the Plaintiffs provide is that RMD engaged in discussions with GDOT sometime in 2021 to obtain SAE's contract and that "RMD knew that it could not obtain the contract from a DBE unless it discredited that DBE, SolutionsAe." (2d Am. Compl. ¶ 75).

Nothing in these allegations plausibly asserts that any interference that RMD did was improper or nonprivileged. The Georgia Supreme Court has recognized a privilege of competition and adopted the Restatement (First) of Torts' standard for determining whether that privilege exists. *Orkin Exterminating Co., Inc. v. Martin, Co.*, 240 Ga. 662, 666 (1978). The Restatement provides:

> One is privileged purposely to cause a third person not to enter into or continue a business relation with a competitor of the actor if[:] (a) the relation concerns a matter involved in the competition between the actor and the competitor, and (b) the actor does not employ improper means, and (c) the actor does not intend thereby to create or continue an illegal restraint of competition, and (d) the actor's purpose is at least in part to advance his interest in his competition with the other.

RESTATEMENT (FIRST) OF TORTS § 768 (AM. L. INST. 1939). There is no dispute that SAE and RMD were competitors and that RMD acted to get business that was previously given to SAE. However, the Plaintiffs assert absolutely nothing about the means by which RMD interfered. In fact, the Plaintiffs fail to even

17

state that RMD actually discredited SAE in its discussions with GDOT officials, just that RMD knew it had to in order to get the contract. Without any allegations plausibly asserting improper means, Plaintiffs fail to state a claim for tortious interference with business relations. Thus, regardless of which tortious interference cause of action the Plaintiffs are pursuing, Count VIII should be dismissed.

## IV.  Conclusion

For the foregoing reasons, Defendant RMD's Motion to Dismiss [Doc. 35] is GRANTED, and the GDOT Defendants' Motion to Dismiss [Doc. 37] is GRANTED as to Counts II, V, and VII in full as well as Counts I, III, and IV with respect to Defendants GDOT, McMurray, Wilson, Johnson, Latimer, Alonso, and Denard. The GDOT Defendants' Motion to Dismiss [Doc. 37] is DENIED as to Counts I, III, and IV with respect to Defendant Reule. The GDOT Defendants' Motion to Stay Discovery [Doc. 38] is DENIED as moot.

SO ORDERED, this  1st  day of October, 2024.

                                                                               */s/ Thomas W. Thrash*
                                                                    THOMAS W. THRASH, JR.
                                                                    United States District Judge